**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| SAMMY LEE SANDERS, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | No. 10-CV-695-TCK-PJC |
| | ) | |
| JIM FARRIS, Warden,[1] | ) | |
| Lexington Correctional Center, | ) | |
| | ) | |
| Respondent. | ) | |

## OPINION AND ORDER

Before the Court is the 28 U.S.C. § 2254 habeas corpus petition (Dkt. # 1) filed by Petitioner

Sammy Lee Sanders, a state prisoner appearing pro se.  Respondent filed a response to the petition

(Dkt. # 9), and provided the state court record necessary for resolution of Petitioner's claims (Dkt.

## 10, 11).  Petitioner filed a reply (Dkt. # 16) and a motion for ruling (Dkt. # 20).  For the reasons

discussed below, the Court finds the petition for writ of habeas corpus shall be denied.

## BACKGROUND

Pursuant to 28 U.S.C. § 2254(e)(1), the historical facts found by the state court are presumed

correct.  Following review of the record, trial transcripts, trial exhibits, and other materials submitted

by the parties, the Court finds the summary by the Oklahoma Court of Criminal Appeals (OCCA)

is adequate and accurate.  Therefore, the Court adopts the following summary as its own[2]:

---

[1]Jim Farris is the current warden of Lexington Correctional Center where Petitioner is in custody.  Pursuant to Rule 2(a), Rules Governing Section 2254 Cases, and Rule 25(d)(1), Federal Rules of Civil Procedure, Jim Farris is hereby substituted as the respondent in this case.  The Court Clerk shall be directed to note such substitution on the record.

[2]Additional facts, apparent from the record, may be presented throughout this opinion as they become pertinent to the Court's analysis.

Late on the evening of May 26, 2004, Appellant left the house that he lived in with his girlfriend, Lisa Jennings, and her teen aged son, James Hill. He did not come home that night. The next morning, Jennings and Hill woke up when Appellant fell through the front door. Appellant was holding his side and told Jennings that he had been injured in a shoot out. He said that he shot Tammy Rohde three times in the head. Appellant was wet and was wearing only shoes, underwear and pants. He smelled of gasoline and said that he was wet because he had jumped in the creek. Although Appellant had blood in his hairline down to his eyebrow and across the bridge of his nose, he was not cut. He had not been shot but did, however, have scratches all over his chest. Jennings cleaned Appellant and he went to sleep.

When Appellant woke up, he made Jennings call her sister and get her sister's car. When they had the car, Appellant and Jennings went to a store where Appellant bought a lighter so that they could go to Tammy Rohde's house and burn it to destroy evidence. He told Jennings that he had poured gasoline and paint thinner all over the place after the shooting but he had not started a fire because he could not find a lighter. When they approached Rohde's residence they turned around because the road was blocked by the police. However, Appellant and Jennings took other steps to destroy evidence. Jennings had Appellant burn his shoes and pants in their yard and Appellant had Jennings remove bullets from his truck. She threw them into the back yard. Appellant also took a white metal chair that he had used for target practice and threw it into the woods because it had a bullet in it from the gun he had used to shoot Rohde. Appellant told Jennings he had already disposed of the gun by throwing it into a ravine.

Although Appellant had indicated to Hill the preceding day that he wanted to get something to pawn, he told Hill the next morning when he came home, that he hadn't found anything to pawn. Appellant told Hill that he had wanted to take Rohde's speakers but because Rohde was higher on the poverty line than they were, he didn't feel that it was right to take them from her.

On the morning of May 27, 2004, a fire fighter and paramedic were dispatched to the home of Tammy Rohde on a report of a cardiac arrest. When they arrived, Rohde was already deceased. She was nude, on the floor in the living room of her trailer and it was apparent that she had suffered a head wound. The scene was secured and turned over to the OSBI for processing. OSBI Agent Danny Mouttet with the Crime Scene Unit responded to the scene and first noticed a stereo speaker on the front porch in the doorway just outside the threshold. It appeared to have been recently placed there because it was relatively clean and did not appear to have been exposed to the elements. When he went inside the residence, he smelled a strong chemical odor and saw "solvent type cans." Tammy Rohde's body was on the floor in the living room. A stereo speaker was against the body and a broom handle was on the speaker above the body. The plastic end of the broom handle was broken and on it was what appeared to be blood and tissue transfer. Agent Mouttet noted wounds to Rohde's head, arms and hands. A nine millimeter shell casing was found in a blood pool on the couch. Appellant's wallet was on the floor next to Rohde's leg.

2

The gun Appellant possessed before the shooting was a nine millimeter pistol given to him by his friend, Robert Maines. A few days after the shooting, on the evening of May 29, 2004, Appellant and Jennings went to Maines's residence. Appellant told Jennings that he wanted to kill Maines and everyone there and burn down the house so that Maines would not tell the authorities that he had given Appellant a gun. Appellant went to the house while Jennings remained in the car. When Appellant learned from the people in the house that Maines was not there, he forced his way inside to wait for Maines. He told the people present that he wanted to talk to Maines about a gun he had borrowed from him. Appellant threatened to kill the people who were at Maines's house, and told them that he had just killed someone two days earlier. While Appellant was in the house, Jennings called the police. When the police arrived Appellant left through a back window but was subsequently apprehended.

An autopsy revealed that Rohde had been shot three times in the head and that she suffered a gunshot wound to her hand. A broken plastic tip of a broomstick was found inside her rectum. She died from the gunshot wounds to her head.

A firearms and tool mark examiner with the OSBI tested the shell casings found at Rohde's trailer, Jeff Taylor's residence and scattered behind Appellant's house and determined that they all were fired from the same firearm. DNA analysis of the victim's fingernail clippings revealed the presence of blood containing a mixture of DNA. The sources of both Tammy Rohde and Appellant could not be excluded as potential contributors to this mixture.

When interviewed, Appellant told OSBI Agent Shawn Ward that he had gone to Rohde's home the night before she was killed to help her move some speakers. He admitted that he had sexual intercourse with Rohde the night before she was killed and claimed that he left shortly thereafter and went home. Appellant denied possessing or owning any type of gun and denied that he had killed Rohde.

See Dkt. # 9-3, Sanders v. State, No. F-2008-548 (Okla. Crim. App. Oct. 12, 2009) (footnotes omitted). Following the May 29, 2004 incident at the Maines' resident and Petitioner's subsequent apprehension, Petitioner was charged in the United States District Court for the Eastern District of Oklahoma with Felon in Possession of a Firearm. Petitioner pled guilty and, on December 15, 2004, he was sentenced to 71 months in custody of the Federal Bureau of Prisons (BOP). See United States v. Sanders, Case No. 04-CR-066 (E.D. Okla. 2004).

On October 10, 2006, Petitioner was charged by Information filed in Mayes County District Court, Case No. CF-2006-267, with the crime of murder in the first degree. See Dkt. # 11-4, O.R.

3

at 1-2.  At that time, Petitioner was in BOP custody, confined in Leavenworth, Kansas.  Id. at 15-16.

Petitioner was tried by a jury and found guilty.  See Dkt. # 11-2, Tr. Vol. III at 862.  The trial judge,

in accordance with the jury's recommendation, sentenced Petitioner to life without parole.  (Dkt. #

11-3).  Petitioner was represented at trial by attorney Brant Shallenburger.

Represented by attorney Michael D. Morehead, Petitioner perfected a direct appeal to the

OCCA.  Petitioner raised four (4) propositions of error, as follows:

| | |
|---|---|
| Proposition I: | Trial court erred when it imposed conditions on the admissibility of relevant evidence which resulted in defense counsel failing to utilize powerful impeachment evidence in violation of Mr. Sanders' right to put on a complete defense. |
| Proposition II: | Improper argument by the prosecutor deprived Mr. Sanders of a fair trial as contemplated by the Due Process Clause of the Fourteenth Amendment and by article II, §§ 7, 20 of the Oklahoma Constitution. |
| Proposition III: | Mr. Sanders was denied the effective assistance of counsel. |
| Proposition IV: | The accumulation of errors deprived Mr. Sanders of a fair trial. |

(Dkt. # 9-1).  In an unpublished opinion filed October 12, 2009, Case No. F-2008-548, the OCCA

rejected the claims and affirmed the judgment of the district court.  (Dkt. # 9-3).

On June 28, 2010, Petitioner filed a pro se application for post-conviction relief in Mayes

County District Court.  The state court denied relief on July 23, 2010.  On August 27, 2010,

Petitioner filed a post-conviction appeal to the OCCA raising three (3) propositions, summarized

by the Court as follows:

| | |
|---|---|
| Proposition I: | Ineffective assistance of appellate counsel for failing to raise known use of perjured testimony by trial prosecutor. |
| Proposition II: | Ineffective assistance of appellate counsel for failing to raise issue of prosecutorial misconduct by shifting the burden of proof. |

Proposition III:      Ineffective assistance of appellate counsel for failing to raise <u>Brady</u>[3] violation by trial prosecutor.

(Dkt. # 9-4).  On September 16, 2010, the OCCA dismissed the appeal based on three procedural grounds.  The OCCA found that Petitioner (1) failed to attach "a copy of the District Court order to his pleadings" in violation of Rule 5.2(C)(2); (2) filed his post-conviction appeal more than thirty days from the date of the final order of the District Court; and (3) failed to file a Notice of Post-Conviction Appeal with the district court.  (Dkt. # 9-5).

On October 28, 2010, Petitioner filed his habeas corpus petition.  (Dkt. # 1).  He identifies the following seven (7) grounds of error:

Ground I:      Trial court erred when it imposed conditions on the admissibility of evidence, violation 6th and 14th amendments

Ground II:     Improper arguments by the prosecutor deprived Petitioner of a fair trial

Ground III:    Defendant was denied effective assistance of trial counsel in violation of 6th and 14th amendments

Ground IV:     Ineffective assistance of appellate counsel for not raising the issue of the prosecutor using known perjured testimony, violating the 6th and 14th amendment

Ground V:      Ineffective assistance of appellate counsel for failure to raise the issue of the prosecutor shifting the burden of proof, violating the 6th and 14th amendment

Ground VI:     Ineffective assistance of appellate counsel for failure to raise a <u>Brady</u> violation because prosecutor failed to provide statements of witnesses during discovery

Ground VII:    Cumulation of errors resulted in an unfair trial

---

[3] <u>Brady v. Maryland</u>, 373 U.S. 83, 87 (1963) (holding that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution").

(Dkt. # 1).  Respondent asserts that Grounds IV, V, and VI are procedurally barred, that Ground I is a state law issue, and that Grounds II, III, and VII, as decided by the OCCA, were not contrary to or an unreasonable application of Supreme Court precedent or federal law.  (Dkt. # 9).

## ANALYSIS

**A.**     **Exhaustion/Evidentiary hearing**

As a preliminary matter, the Court must determine whether Petitioner meets the exhaustion requirements of 28 U.S.C. § 2254(b) and (c).  See Rose v. Lundy, 455 U.S. 509, 510 (1982). Petitioner fairly presented the substance of his claims to the OCCA on direct and post-conviction appeal.  Therefore, the exhaustion requirement of 28 U.S.C. § 2254(b) is satisfied.

In addition, the Court finds that Petitioner is not entitled to an evidentiary hearing.  See Williams v. Taylor, 529 U.S. 420 (2000).

**B.**     **Claims adjudicated by the OCCA**

The Antiterrorism and Effective Death Penalty Act (AEDPA) provides the standard to be applied by federal courts reviewing constitutional claims brought by prisoners challenging state convictions.  Under the AEDPA, when a state court has adjudicated a claim, a petitioner may obtain federal habeas relief only if the state decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  See 28 U.S.C. § 2254(d); Williams v. Taylor, 529 U.S. 362, 386 (2000); Neill v. Gibson, 278 F.3d 1044, 1050-51 (10th Cir. 2001).  When a state court applies the correct federal law to deny relief, a federal habeas court may consider only whether the state court applied the federal law in an objectively reasonable manner.  See Bell v. Cone, 535 U.S.

6

685, 699 (2002); Hooper v. Mullin, 314 F.3d 1162, 1169 (10th Cir. 2002).  Furthermore, the "determination of a factual issue made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."  28 U.S.C. § 2254(e)(1).

### 1.      Ground I: Trial court erred by placing conditions on admissibility of evidence

In his first ground of error, Petitioner contends that it was improper for the trial judge to place conditions on the admissibility of a letter Petitioner wanted to use to impeach a witness.  The handwritten letter in question was written by the State's main witness and Petitioner's live-in girlfriend, Lisa Jennings, to Petitioner while he was in federal prison.  Ms. Jennings wrote that she was "sorry for what [she'd] done to [Petitioner], for calling the cops and for lying on [Petitioner]." (Dkt. # 9-7 at 6).  The letter was first introduced into the record during defense counsel's cross-examination of Ms. Jennings.  (Dkt. # 11-1, Tr. Vol. II at 537).  Prior to any questions regarding the letter from defense counsel, the prosecutor objected because the letter was not furnished to the State in discovery.  Id.  The court sustained the State's objection, based on the discovery violation, but permitted defense counsel to make an offer of proof.  Id. at 538.  At the conclusion of the presentation of evidence, and prior to closing arguments, counsel for the State and Petitioner met with the trial judge in chambers to go through the jury instructions.  At the conclusion of this meeting, the trial judge clarified the record regarding the letter.  (Dkt. # 11-2, Tr. Vol. III at 817-19). The trial judge noted that in a prior, off the record discussion, he told the parties that if the defense decided to recall Ms. Jennings to the stand, he would allow "a full discussion" about the letter, including "the date and under what circumstances the letter was written." Id. at 818.  This would include "[t]he facts of how it transpired . . . and the other circumstances [that] could be admitted

7

including but not limited to . . . the other incident . . . at the Maines residence." Id. at 818-19. Defense counsel chose not to admit the letter or question Ms. Jennings about the letter.

The circumstances under which the letter was written were of importance because of a pretrial ruling. Petitioner's trial counsel filed a motion in limine seeking to prevent the state "from arguing during voir dire examination, opening statements, closing statements, questions, answers, statement, objections, or by means of any other device" about other alleged bad acts of the Petitioner. (Dkt. # 11-4, O.R. at 66-67). The trial judge granted the motion in part, prohibiting the State from introducing evidence of Petitioner's "possession or pointing of a shotgun" at the Maines' residence. Id. at 71. This included references to Petitioner's incarceration in federal prison when he was charged with First Degree Murder in Mayes County. See Dkt. # 11-1, Tr. Vol. II at 529-536. Even though Petitioner wanted Ms. Jennings questioned about the letter, defense counsel made the decision "to not admit that letter or question [Ms. Jennings] regarding" it.   (Dkt. # 11-2, Tr. Vol. III at 819).

In resolving Petitioner's claim on direct appeal, the OCCA stated that "decisions regarding the admissibility of evidence are discretionary with the trial court and will not be disturbed on appeal unless clearly erroneous or manifestly unreasonable." (Dkt. # 9-3 at 7). It determined that "the circumstances of the letter, while ruled inadmissible under 12 O.S.2001, § 2404(B) as evidence of other crimes, would have been relevant to the purpose for which the defense sought to admit the letter which was a challenge to Jenning's [sic] credibility." Id. Therefore, the OCCA concluded that "[t]he trial court did not abuse its discretion in imposing conditions on the admission of [the letter]." Id.

Respondent argues that "habeas review is not available to correct state law evidentiary errors" and that the OCCA's finding that the trial court did not abuse its discretion "is not contrary to or an unreasonable application of clearly established federal law."  (Dkt. # 9 at 6, 8).  Citing James v. Gibson, 211 F.3d 543 (10th Cir. 2000), Respondent argues that the federal courts cannot issue a "writ of habeas corpus on the basis of a perceived error of state law" unless this Court determines the violation of state law rendered the state proceedings "fundamentally unfair."  Id. at 5.

A federal habeas court has no authority to review a state court's interpretation or application of its own state laws.  Estelle v. McGuire, 502 U.S. 62, 67-68 (1991) (emphasizing that it is not the province of a federal habeas court to reexamine state court determinations on state-law questions).  Instead, when "conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States."  Id. at 68 (citations omitted).  To the extent Petitioner claims the state courts violated the Oklahoma Constitution or Oklahoma statutory law, those claims are denied because they are not cognizable on federal habeas corpus review.  Thus, this Court will review Ground I to determine whether Petitioner was denied due process and a fair trial.

Petitioner claims the "trial court erred when it imposed conditions" on the use of the letter. (Dkt. # 1).  He argues that he was "denied the right to put on a full and fair trial" through no fault of his own because his defense counsel overrode his desire to have the letter admitted and to question Ms. Jennings on its contents.  Petitioner states that the circumstances surrounding the letter were,

> already paraded in front of the jury when [Ms.] Jennings brought up the fact that
> [Petitioner] went to jail the night he went to Robert Maines' house and everthing that

supposedly happened that night . . . and throughout [Ms.] Jennings', [Shelly] Fleetwood's, and [Amie] Bristol's testimony, this very night, the night of May 29, 2004 was discussed in great detail in front of the jury. So it would not have hurt [Petitioner] for the jury to have heard it one more time, it had already been discussed over three times . . . . Whether by the judge or defense counsel, [Petitioner] was denied the right to be a meaningful part of his defense.

(Dkt. # 16 at 3-4) (citing Dkt. # 11-1, Tr. Vol. II at 507). Respondent argues that the trial court's reconsideration of the letter, "gave the Petitioner the opportunity to admit the letter, and therefore did not deny him a fair opportunity to defend himself." (Dkt. # 9 at 8). Petitioner, in his appellate brief in state court, the Respondent, and the OCCA all cite Chambers v. Mississippi, 410 U.S. 284 (1973), for guidance in the admissibility of this letter. In Chambers, the defendant was not allowed to cross-examine a particular witness nor allowed to present his own witnesses to discredit that witness based on the evidentiary rules in effect in Mississippi at the time. Chambers, 410 U.S. at 294. The Court stated that "[t]he right of cross-examination is more than a desirable rule of trial procedure. It is implicit in the constitutional right of confrontation, and helps assure the 'accuracy of the truth-determining process.'" Id. at 295 (citations omitted). However, "the right to confront and cross-examine is not absolute and may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process." Id.

Petitioner was faced with a dilemma over the use of impeachment evidence, but was not denied the right to cross-examine Ms. Jennings nor absolutely denied the right to introduce this impeachment evidence to the jury. A review of the record shows that Ms. Jennings was subjected to a vigorous cross-examination by Petitioner's defense counsel and that the letter was but one method of impeachment available to defense counsel at trial. Thus, this Court finds that Petitioner was not denied the opportunity to present a defense and his trial was not rendered fundamentally unfair by the trial judge's evidentiary ruling. Therefore, habeas relief is denied as to Ground I.

2.      **Ground II: Prosecutorial misconduct**

In the second ground of error, Petitioner claims that the prosecutor made "improper arguments" during closing arguments, depriving Petitioner of a fair trial.  (Dkt. # 1).  Petitioner focuses on two particular topics – mischaracterization of the DNA and forensic evidence and a confession made by Petitioner.  Id.  Defense counsel did not object to the prosecutor's statements. The OCCA reviewed Petitioner's proposition under a plain error standard because no objection was raised at trial.  (Dkt. # 9-3 at 8).  The OCCA stated that it "will not grant relief based on prosecutorial misconduct unless the State's argument is so flagrant and that it so infected the defendant's trial that it was rendered fundamentally unfair."  Id. at 7-8.  It then concluded that "[g]iven the magnitude of the State's evidence against" Petitioner, it could not find any inappropriate comments which deprived Petitioner of a fair trial or "affect[ed] the jury's finding of guilt or assessment of punishment.  There was no plain error here."  Id. at 8.

Respondent argues that "[i]mproper prosecutorial remarks do not warrant federal habeas relief unless the challenged statements 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" (Dkt. # 9 at 9 (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974))).  Respondent states that the "challenged comments did not manipulate or misstate the evidence, nor did they implicate other specific rights of the accused."  Id. at 10.  Further, Respondent argues that "Petitioner wholly failed to show . . . that the comments were improper much less that they denied him a fundamentally fair proceeding."  Id. at 11.  Respondent concludes that the OCCA's finding "that no error occurred in the complained of comments," was proper and "habeas relief is not warranted."  Id. at 9.

The Tenth Circuit Court of Appeals has found "no practical distinction" between the formulations of plain error used by the OCCA and the federal due process test, requiring reversal when an error "so infused the trial with unfairness as to deny due process of law." Thornburg v. Mullin, 422 F.3d 1113, 1125 (10th Cir. 2005) (internal quotations omitted).  Because the OCCA applied the plain error test, the same test required for a due process determination, this Court defers to its ruling unless it "unreasonably appli[ed]" that test. Id. (citing 28 U.S.C. § 2254(d)).

Habeas corpus relief is available for prosecutorial misconduct only when the prosecutor's conduct is so egregious, in the context of the entire trial, that it renders the trial fundamentally unfair. DeChristoforo, 416 U.S. at 642-48; Cummings v. Evans, 161 F.3d 610, 618 (10th Cir. 1998). "To view the prosecutor's statements in context, we look first at the strength of the evidence against the defendant and decide whether the prosecutor's statements plausibly could have tipped the scales in favor of the prosecution." Fero v. Kerby, 39 F.3d 1462, 1474 (10th Cir. 1994) (quotations omitted); see also Smallwood v. Gibson, 191 F.3d 1257, 1275-76 (10th Cir. 1999).  While closing arguments are for persuasive purposes, and the jury here was instructed as such, (Dkt. # 11-1, Tr. Vol. II at 318), counsel is allowed some latitude. See Hooper v. Mullin, 314 F.3d 1162, 1172 (10th Cir. 2002) ("The prosecutor also possesses reasonable latitude in drawing inferences from the record."); see also Banks v. Workman, 692 F.3d 1133, 1149 (10th Cir. 2012).  It is important to note that "it is not enough that the prosecutors' remarks were undesirable or even universally condemned." Banks, 692 F.3d at 1149 (quoting Darden v. Wainwright, 477 U.S. 168, 181 (1986)).  The remarks must infect the trial with unfairness. Id.

Petitioner first claims that the prosecutor improperly mischaracterized the DNA and forensic evidence.  Petitioner states that "the prosecutor told the jury during closing arguments that they (the

authorities) found [Petitioner's] blood (DNA) under the fingernails of the victim.  He said that it was a fact."  (Dkt. # 1 at 6).  Petitioner argues that "the DNA specialist says [sic] that [Petitioner] could not be excluded or included which is very different and very prejudicial" from what the prosecutor told the jury.  Id. at 6-7.  In his reply to Respondent's response, Petitioner also complains that the statements made by the prosecutor during closing arguments about "the P 30 component," a component of seminal fluid, were an "out right lie."  (Dkt. # 16 at 6).

During closing arguments, the prosecutor made several references to the testimony from the State's DNA expert, J.D. Lindstrom, a criminalist and expert in forensic biology.  The prosecutor made four specific statements regarding the DNA evidence and one about the P 30 component, as complained of by Petitioner.  In his first closing argument, the prosecutor told the jury that "[Petitioner's] blood was found . . . under [Ms. Rohde's] finger nails."  (Dkt. # 11-2, Tr. Vol. III at 839).  He later said, "[s]o we know it was his weapon, we know that his DNA was found, we know that he went over to the residence of Tammy Rohde, we know that afterwards he disposed of shell casings, his clothing, his chair."  Id. at 841.  The prosecutor also referenced the "P 30 component" testimony in his first closing argument.  He told the jury,

> We know, ladies and gentlemen, he had oral sex with her because P 30, a component of the seminal fluid, was found in the oral swab. We know that he had anal sex with her because P 30 was found in the sample on the broom. Scratches to his side, an indication, ladies and gentlemen, that this wasn't all consensual, was it?

Id. at 838.

In his second closing argument, the prosecutor said, "[Petitioner's] the one that had the nine millimeter pistol that he always carried and it's his DNA that was found underneath [the victim's] fingertips, not Lisa Jennings['']."  Id. at 856.  A short time later, the prosecutor told the jury,

I had DNA evidence.  That is the most crucial of all I believe. Sammy Sanders' DNA was found at the scene under Tammy Rohde's fingernails. As I said, ladies and gentlemen, usually when a couple or two people engage in consensual sex, they don't end up with blood underneath the victim's fingernails.

Why wasn't Lisa Jennings' DNA taken? Because J. D. Lindstrom told you there were only two DNAs found in that sample, Sammy Sanders and Tammy Rohde. Why take it? Those are the only two people involved. There is no evidence to link Lisa Jennings with this crime. But, ladies and gentlemen, the evidence is there for Sammy Sanders. He gets rid of the gun, he burns his clothes, he gets rid of the ammunition, he gets rid of the chair. The only thing he can't get rid of is the DNA and the shell casings, and they all match.

Id. at 858-59.  Defense counsel did not object to any of these statements.

On appeal, the OCCA reviewed the statements Petitioner complained of under a plain error standard.  See Dkt. # 9-3.  Though the court did not analyze each statement individually, it did make a distinction.  The court stated that,

Most of the comments at issue in the present case fell within the broad parameters of effective advocacy and do not constitute error.  Martinez v. State, 1999 OK CR 33, ¶ 44, 984 P.2d 813, 825.  We review those comments bordering upon impropriety within the context of the entire trial, considering not only the propriety of the prosecutor's actions, but also the strength of the evidence against the defendant and the corresponding arguments of defense counsel.  DeRosa v. State, 2004 OK CR 19, ¶ 53, 89 P.3d 1124, 1145.  Given the magnitude of the State's evidence against Appellant this Court can find that any inappropriate comments did not deprive Appellant of a fair trial or affect the jury's finding of guilt or assessment of punishment.  There was no plain error here.

Id. at 8.

Petitioner is correct when he states that Mr. Lindstrom never said that Petitioner's "blood (DNA) [was found] under the fingernails of the victim."  (Dkt. # 1 at 6).  Mr. Lindstrom did not directly testify that Petitioner's blood or DNA was "found at the scene," nor did he testify that it was found under Ms. Rohde's fingernails.  (Dkt. # 11-2, Tr. Vol. III at 755-85).  Mr. Lindstrom stated that a sample of "debris" from the hand of Ms. Rohde contained a DNA "mixture."  Based on a known sample of DNA from Petitioner, Mr. Lindstrom could say only that in "the DNA profile [of

14

the sample], the minor component, [Petitioner] cannot be excluded as being a potential contributor to this profile." Id. at 764, 766-67. Later in Mr. Lindstrom's testimony, while referencing a different DNA sample, Mr. Lindstrom stated that "[Petitioner's] profile . . . is included in that mixture." Id. at 769. Yet, when discussing every other DNA sample – samples from under the fingernail clippings (id. at 768), an oral swab containing a sperm portion of mixed DNA (id. at 772), and a sample from the broom handle (id. at 775-76) – Mr. Lindstrom stated only that Petitioner's profile could not be excluded. Of importance, however, is that other witnesses testified that Petitioner admitted to having sex with Ms. Rohde the night she was murdered. (Dkt. # 11-1, Tr. Vol. II at 323, Dkt. # 11-2, Tr. Vol. III at 684, 778, 831, 838).

Petitioner also complains of statements made by the prosecutor regarding the "P 30 component." As part of the forensic analysis, Mr. Lindstrom performed tests on swabs taken from Ms. Rohde's mouth and anus and swabs taken from the broom handle. These tests included looking for sperm and "a chemical test known as P 30 . . . [that] look[s] at a protein that is found in very high concentrations in seminal fluid." (Dkt. # 11-2, Tr. Vol. III at 772-73). Mr. Lindstrom testified that "no sperm were observed" in the results. Id. at 773, 776. However, P 30 was detected in each sample. Id. at 773, 776. When asked on cross-examination whether these results would confirm that Petitioner and Ms. Rohde had oral sex, Mr. Lindstrom responded, "The results that I have up there, what that could confirm is that there is DNA from both individuals present on that sample." Id. at 778. When asked again, on cross-examination, whether the results "exclude the possibility that a couple had had oral sex," Mr. Lindstrom responded that "I don't know that it would include or exclude . . . I can simply say that there is a mixture of DNA present and those two individuals could not be excluded from that mixture of DNA on that sample. How the DNA got on that sample is

15

outside my area of expertise." Id.  Based on the combined testimony of the expert and other witnesses, the Court finds that although the prosecutor's statements were not a completely accurate portrayal of the testimony provided by the forensic expert during trial, the statements were reasonable inferences and did not "infect the trial with unfairness." Banks, 692 F.3d at 1149. Therefore, after a review of the entire record, the Court concludes that the OCCA did not unreasonably apply the plain error test, the functional equivalent of the federal due process test, in rejecting Petitioner's claims challenging the prosecutor's mischaracterization of the DNA evidence. Thornburg, 422 F.3d at 1125.

Petitioner's second complaint of statements made by the prosecutor concerns an alleged confession made by Petitioner.  During his first closing argument, the prosecutor stated, "[Petitioner] told Shelly Fleetwood that he killed Tammy Rohde. What more do you need? . . . The defendant has confessed to Shelly Fleetwood that he killed Tammy Rohde." Id. at 839.  During his second closing argument, the prosecutor again said, "[Petitioner] told Lisa Jennings he did it, he told Shelly Fleetwood that he did it and he told Amie Bristol I've killed before, I'll do it again." Id. at 859. Defense counsel did not object.  Petitioner argues that Shelly Fleetwood did not give such testimony. (Dkt. ## 1, 16).

Shelly Fleetwood, a witness for the State, testified that on May 29, 2004, she was at the house of Robert Maines, an acquaintance of Petitioner's.  (Dkt. # 11-1, Tr. Vol. II at 602).  Petitioner came to the house late at night to talk to Mr. Maines.  Id. at 604.  Mr. Maines was not home, but Petitioner came inside anyway.  While waiting for Mr. Maines to return home, Petitioner grabbed

a gun and pointed it at Ms. Fleetwood and two others in the house.[4]  This is the incident for which

Petitioner was sentenced to 71 months in federal prison.  He was serving this sentence at the time

of his murder trial.  Shelly Fleetwood testified that after Petitioner arrived at Mr. Maines' house, he

made threats:

> Q:    And during the time that [Petitioner] was there waiting for Robert Maines, did he
>        threaten you at all?
>
> A:    Well, yeah.
>
> Q:    Okay.  What did he say that you thought was threatening?
>
> A:    He just went around and, and asked us our name and told us he had just killed
>        somebody two days before.
>
> Q:    Okay.
>
> A:    And that he wasn't in the mood, I mean, for us to laugh at him or whatever.

(Dkt. # 11-1, Tr. Vol. II at 604).  Respondent argues that it was an entirely reasonable inference for

the prosecutor "to interpret Petitioner's statements that he had 'just killed somebody two days

before' to mean that he was speaking of his murder of the victim [Ms. Rohde]."  (Dkt. # 9 at 13).

 Respondent argues that this inference was based on the time-line of the facts, and states that "the

evidence presented in this case showed the Petitioner could have been referring to no one other than

the victim when he told Fleetwood . . . that he had killed someone two days before."  Id. at 13-14.

The Court finds that, while the prosecutor may have stretched the testimony of Shelly

Fleetwood, the comments were a reasonable inference and did not result in a fundamentally unfair

trial.  The inference made by the prosecutor is plausible and, because the jury had the same time-

---

[4]Though testimony of these particular details was not permitted at trial, the affidavit of OSBI
Special Agent Shawn Ward conveys this sequence of events.  See Dkt. # 11-4, O.R.  at 7.

line, an inference the jury could have easily drawn itself.  Furthermore, even though Petitioner did not confess to Ms. Fleetwood, Ms. Jennings did testify that Petitioner confessed to her that he had shot Ms. Rohde three times. (Dkt. # 11-1, Tr. Vol. II at 496).  A confession by Petitioner was not new information before the jury.

In summary, this Court finds that, when viewed against the magnitude of the evidence against Petitioner, any improper statements made by the prosecutor during closing arguments did not result in a fundamentally unfair trial.  The evidence against Petitioner was compelling.  The State provided evidence showing that Petitioner had possession of the type of gun used in the murder,[5] the State linked the shell casings found at the victim's house to shell casings found at Petitioner's house,[6] Petitioner's wallet was lying next to victim's body,[7] Petitioner told Ms. Jennings that he shot the victim, and Petitioner had burned the clothes that he was wearing that night.  In light of that

---

[5]The gun used to kill Ms. Rohde was never recovered.  However, the OSBI established Petitioner's possession of the gun through Mr. Maines.  Petitioner borrowed the gun from Mr. Maines "to protect his family."  (Dkt. # 11-1, Tr. Vol. II at 452-53).  "Maines had purchased the gun from Jeff Taylor, who had owned it for about a month before selling it to Maines. While he owned the gun, Taylor shot it by his house. The OSBI collected shell casings from Taylor's property."  See Dkt. # 9-3, Sanders v. State, No. F-2008-548, slip op. at 2 n.1, 4 n.4 (Okla. Crim. App. Oct. 12, 2009).

[6]"Two additional shell casings were found in the couch and turned over to the OSBI by Tammy Rohde's brother, Gene Rohde, a few days after the murder. Several weeks later, on June 26, 2004, when other family members went to Rohde's trailer to clean, three additional shell casings were found in the living room and also turned over to the OSBI."  See Dkt. # 9-3, Sanders v. State, No. F-2008-548, slip op. at 3 n.2 (Okla. Crim. App. Oct. 12, 2009).

[7]"Although the wallet can be seen in a photo taken at the time the scene was investigated on May 27, 2004, it was not collected by OSBI during the initial investigation of the crime scene. Rather, the wallet was collected after it was found by Tracy Myres, Rohde's cousin, on May 28, 2004, when she went to Rohde's trailer to try to find Rohde's wallet and ID for Rohde's mother. When Myres found the wallet and discovered that it contained Appellant's ID, she put it back where she had found it and called law enforcement."   See Dkt. # 9-3, Sanders, slip op. at 3 n.3 (Okla. Crim. App. Oct. 12, 2009).

evidence, Petitioner has not demonstrated that the comments by the prosecutor so infected his trial

with unfairness as to deny him due process.  Neill, 278 F.3d at 1061 (citing Darden w. Wainwright,

477 U.S. 168, 181 (1986)).  Petitioner also fails to convince the Court that the OCCA's decision was

an unreasonable application of federal law.  28 U.S.C. § 2254(d).  Petitioner is not entitled to habeas

relief on Ground II.

### 3.    Ground III: Ineffective assistance of trial counsel

Petitioner's third ground of error is that his trial counsel "failed to marshal evidence, . . .

failed to object to prosecutor's multiple misstatements . . . , and failed to utilize impeachment

evidence."  (Dkt. # 1).  On direct appeal, Petitioner claimed his trial counsel failed "to marshal all

available evidence in closing argument and fail[ed] to object to the numerous instances of

prosecutorial misconduct alleged" in Ground II.  (Dkt. # 9-3 at 9).  The OCCA, citing Strickland v.

Washington, determined that "[a]lthough [defense counsel] did not . . . make every argument

possible, [it could] not find that defense counsel's omissions rendered his performance deficient."

Id.  Thus, Petitioner was "not deprived of his constitutional right to the effective assistance of

counsel."  Id.

Respondent states the OCCA's opinion was not "contrary to or an unreasonable application

of Strickland or any other Supreme Court precedent."  (Dkt. # 9 at 24).  It was "Petitioner's theory

of defense . . . that it was his girlfriend, Lisa Jennings, and not he who murdered the victim."  Id. at

21.  Respondent argues that Petitioner's "defense counsel made a thorough argument in attempting

to persuade the jurors that it was Jennings and not [Petitioner] who murdered the victim."  Id. at 22.

Respondent further argues that "it was a strategic decision on defense counsel's part . . . , and such

decision cannot form the basis of an ineffective assistance of counsel claim."  Id. at 22, 23, 24.

19

Under the familiar, two-prong constitutional standard set forth in <u>Strickland v. Washington</u>, 466 U.S. 668 (1984), Petitioner must demonstrate that his counsel's performance was deficient and that the deficient performance was prejudicial. <u>Id.</u> at 687; <u>Osborn v. Shillinger</u>, 997 F.2d 1324, 1328 (10th Cir. 1993). Petitioner must establish the first prong by showing that his counsel performed below the level expected from a reasonably competent attorney in criminal cases. <u>Strickland</u>, 466 U.S. at 687-88. There is a "strong presumption that counsel's conduct falls within the range of reasonable professional assistance." <u>Id.</u> at 689. Moreover, review of counsel's performance must be highly deferential. "[I]t is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." <u>Id.</u> Assessing attorney performance requires every effort to avoid hindsight bias and evaluate conduct from counsel's perspective at the time. <u>Id.</u> "Representation is constitutionally ineffective only if it 'so undermined the proper functioning of the adversarial process' that the defendant was denied a fair trial." <u>Harrington v. Richter</u>, 131 S. Ct. 770, 791 (2011) (quoting <u>Strickland</u>, 466 U.S. at 686). "The <u>Strickland</u> standard must be applied with 'scrupulous care.'" <u>Cullen v. Pinholster</u>, 131 S. Ct. 1388, 1408 (2011) (quoting <u>Richter</u>, 131 S. Ct. at 788).

To establish the second prong, a petitioner must show that this deficient performance prejudiced the defense to the extent that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." <u>Strickland</u>, 466 U.S. at 694; <u>see also</u> <u>Houchin v. Zavaras</u>, 107 F.3d 1465, 1472 (10th Cir. 1997). If a petitioner is unable to show either "deficient performance" or "sufficient prejudice," his claim of ineffective assistance fails. <u>Strickland</u>, 466 U.S. at 700. Thus, it is not always necessary to address both <u>Strickland</u>

20

prongs.  This Court's review of the OCCA's decision on ineffective assistance of counsel claims is "doubly deferential." Pinholster, 131 S. Ct. at 1403 (noting that a habeas court must take a "highly deferential" look at counsel's performance under Strickland and through the "deferential" lens of § 2254(d)).

Petitioner divides his ineffective assistance of counsel claim into two categories – failure to marshal evidence during closing arguments and failure to object to prosecutor's misstatements.  As to counsel's failure to object to the prosecutor's misconduct, the OCCA concluded that "we cannot find defense counsel deficient for failing to object to admissible evidence." (Dkt. # 9-3).  This Court agrees.  As determined above, the statements made by the prosecutor during closing arguments were reasonable inferences based on the entirety of the evidence.  Nor did the statements result in a fundamentally unfair trial.  Therefore, Petitioner's claim of ineffective assistance of counsel based on failure to object to the prosecutor's statements during closing arguments fails.

Petitioner's other category, failure to marshal evidence during closing argument, also fails. Petitioner argued on direct appeal, as he does in his habeas petition, that "the most important evidence was scarcely mentioned" during closing arguments to support Petitioner's theory of defense.  (Dkt. # 9-1 at 24).  Petitioner argues that his defense counsel should have "spared no expense in exposing [the] numerous instances of untruthfulness" in Ms. Jennings' testimony.  Id. at 25.  Respondent rejects this assertion, stating "the record reveals that defense counsel presented a vehement closing argument that it was Jennings, suffering from bipolar disorder, post traumatic stress syndrome, and a borderline personality disorder, who killed the victim out of jealousy." (Dkt. # 9 at 21).  In rejecting this claim on direct appeal, the OCCA determined defense counsel "gave a thorough argument in which he repeatedly challenged Jenning's [sic] credibility." (Dkt. # 9-3 at 9).

21

After reviewing the record, the Court finds that Petitioner received effective assistance of counsel during his murder trial. Based on the record and trial transcripts, Petitioner's defense counsel was well-prepared for all cross-examinations, including that of Ms. Jennings. Defense counsel conducted a thorough cross-examination of Ms. Jennings in which he exposed many of the inconsistencies and changes in her story. (Dkt. # 11-1, Tr. Vol. II at 510-29, 539-43, 547; Dkt. # 11-2, Tr. Vol. III at 808-11). Additionally, during his closing argument, defense counsel made repeated references to Ms. Jennings' lack of truthfulness and pointedly and purposefully told the jury to consider substituting Ms. Jennings' name in place of Petitioner's when evaluating the facts of the case. See Dkt. # 11-2, Tr. Vol. III at 849-50. Defense counsel's statements questioning Ms. Jennings truthfulness were as follows:

> And that's kind of funny that [James Hill] didn't see [the gun] because according to Ms. Jennings when Petitioner retrieved the gun out of the glove box there were three people in the front in a 1950 something Chevy pickup, [Petitioner], Ms. Jennings and James Hill. . . . The only person who saw that despite three people in the car was Lisa Jennings. That's an amazing coincidence, isn't it?

Id. at 845-46.

> Lisa Jennings admitted to you that she knew almost from day one that [Petitioner] and Ms. Rohde had a relationship. She told us she didn't care. I find that very hard to believe.

Id. at 846.

> What I'm curious about is the fact that they say that the fact[s] Lisa Jennings gave, the only way she would have known that is if the person who did the killing had told her. I'll bet there's another way. I'll bet she would have known if she was the one that did the killing. When Agent Ward first talked to her, she told him we were at home that night, we were in bed, we watched David Letterman, that was it. But a couple of days later when . . . Agent Ward comes to her and suggests, . . . we think Sammy did this, what do you know about it? All of sudden she knows every detail of the crime.

Id. at 848-49.  Defense counsel told the jury that Ms. Jennings "deserve[d] to be sitting in that chair where [Petitioner was] sitting being prosecuted . . . for what she did to Tammy Rohde because she . . . was angry, she was jealous."  Id. at 854.

Defense counsel also repeatedly referenced the possibility that Ms. Jennings was the one responsible for the murder and not Petitioner.  Specifically, defense counsel made the following statements during closing arguments:

> [W]hen you put those facts together as you examine the links in that chain, you're going to put that chain together link by link.  Admittedly a lot of those facts they point at [Petitioner], but what if you change the name in those facts? What if you change the name in those facts to Lisa Jennings?

Id. at 846.

> Who had motive in this case?  Who had motive to kill Tammy Rohde who was sleeping with [Petitioner] . . . . [Ms. Jennings'] got a reason to know that her boyfriend, the man she lives with, is having an affair with another woman.

Id. at 847.

> She told you right where the chair was because she was involved in that.  She said, [Petitioner] and I did that.  Well she's always there, isn't she?  I wonder why?  I wonder how she knew all of that?  Was it because [Petitioner] told her or because she shot Tammy Rohde three times in the head and put a broomstick in her rectum and broke it off because she was jealous and angry?

Id. at 849.  The record demonstrates that Petitioner's trial counsel did not perform deficiently. Petitioner has failed to show that the OCCA's adjudication of his claims of ineffective assistance of counsel was contrary to, or an unreasonable application of, Strickland.  He is not entitled to habeas corpus relief as to Ground III.

## 4.    Ground VII: Cumulative error

In Ground VII, Petitioner claims the "combination of errors resulted in an unfair trial." (Dkt. # 1).  The OCCA considered the errors alleged, both singly and cumulatively, and concluded that

they "do not require relief because they did not render his trial fundamentally unfair or taint the jury's verdict." (Dkt. # 9-3 at 9-10).

The Tenth Circuit has repeatedly held that cumulative error analysis is applicable only where there are two or more actual errors. Workman v. Mullin, 342 F.3d 1100, 1116 (10th Cir. 2003). Cumulative impact of non-errors is not part of the analysis. Le v. Mullin, 311 F.3d 1002, 1023 (10th Cir. 2002) (citing United States v. Rivera, 900 F.2d 1462, 1471 (10th Cir. 1990) (en banc)). "[T]he task 'merely' consists of 'aggregat[ing] all the errors that have been found to be harmless' and 'analyz[ing] whether their cumulative effect on the outcome of the trial is such that collectively they can no longer be determined to be harmless.'" Grant v. Trammell, 727 F.3d 1006, 1025 (10th Cir. 2013) (quoting Rivera, 900 F.2d at 1470). "Only if the errors 'so fatally infected the trial that they violated the trial's fundamental fairness' is reversal appropriate." Id. (quoting Matthews v. Workman, 577 F.3d 1175, 1195 n.10 (10th Cir. 2009)). "[A]ll a defendant needs to show is a strong likelihood that the several errors in his case, when considered additively, prejudiced him." Id. at 1026.

The Court does not find two or more actual errors, nor were there constitutional errors that fatally infected the trial. See Matthews, 577 F.3d at 1195 n.10 ("In the federal habeas context, the only otherwise harmless errors that can be aggregated are federal constitutional errors, and such errors will suffice to permit relief under cumulative error doctrine only when the constitutional errors committed in the state court trial so fatally infected the trial that they violated the trial's fundamental fairness."). As a result, there is no basis for a cumulative error analysis. For that reason, Petitioner is not entitled to habeas corpus relief on Ground VII.

C.      **Procedural bar (Grounds IV, V, and VI)**

In Grounds IV, V, and VI, Petitioner complains of ineffective assistance of appellate counsel. In Ground IV, Petitioner alleges that his appellate counsel failed to argue that the prosecutor used known perjured testimony at trial. In Ground V, he contends that his appellate counsel failed to claim that the prosecutor shifted the burden of proof during closing arguments. In Ground VI, Petitioner alleges that appellate counsel failed to raise a <u>Brady</u> violation by the prosecutor.

The record confirms that these three ineffective assistance of appellate counsel claims were raised in Petitioner's application for post-conviction relief. <u>See</u> Dkt. # 9-4. However, the OCCA dismissed Petitioner's post-conviction appeal without reaching the merits for three reasons: (1) Petitioner failed to attach a copy of the district court order to his pleadings as required in Rule 5.2(C)(2), *Rules of the Oklahoma Court of Criminal Appeals*; (2) Petitioner's filing was untimely under Rule 5.2(C)(2), *Rules of the Oklahoma Court of Criminal Appeals*; and, (3) Petitioner failed to file "Notice of Post-Conviction Appeal" from the final order of the district court denying post-conviction relief as required in Rule 5.2(C)(1), *Rules of the Oklahoma Court of Criminal Appeals*. <u>See</u> Dkt. # 9-5. In response to the habeas petition, Respondent argues that this Court should uphold the procedural bar imposed by the OCCA. <u>See</u> Dkt. # 9 at 27. For the reasons discussed below, the Court finds the three claims are procedurally barred.

The doctrine of procedural bar prohibits a federal court from considering a specific habeas claim where the state's highest court declined to reach the merits of that claim on independent and adequate state procedural grounds, unless a petitioner "can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." <u>Coleman v. Thompson</u>, 501

U.S. 722, 750 (1991); see also Maes v. Thomas, 46 F.3d 979, 985 (10th Cir. 1995); Gilbert v. Scott, 941 F.2d 1065, 1067-68 (10th Cir. 1991).   "A state court finding of procedural default is independent if it is separate and distinct from federal law."  Maes, 46 F.3d at 985.  A finding of procedural default is an adequate state ground if it has been applied evenhandedly "'in the vast majority' of cases."  Id. at 986 (quoting Andrews v. Deland, 943 F.2d 1162, 1190 (10th Cir. 1991)).

The OCCA's procedural bar as applied to Petitioner's claims of ineffective assistance of appellate counsel was an "independent" ground because Petitioner's failure to comply with state procedural rules was "the exclusive basis for the state court's holding."  Maes, 46 F.3d at 985. Additionally, the procedural bar was an "adequate" state ground because the OCCA requires strict adherence to procedural rules and consistently dismisses appeals which do not comply with the rules.  See Johnson v. Champion, 288 F.3d 1215, 1227 n.3 (10th Cir. 2002) (concluding that the OCCA's declination of jurisdiction based on Rule 5.2(C)(2) constitutes an independent and adequate state procedural ground).

As a result, the Court finds that habeas corpus relief on Grounds IV, V, and VI shall be denied on the basis of the procedural default doctrine unless Petitioner demonstrates "cause and prejudice" or a "fundamental miscarriage of justice" to excuse his procedural default of the claims. Coleman, 501 U.S. at 750; Maes, 46 F.3d at 985.  To demonstrate "cause," a petitioner is required to "show that some objective factor external to the defense impeded . . . efforts to comply with the state procedural rules."  Murray v. Carrier, 477 U.S. 478, 488 (1986).  Examples of such external factors include the discovery of new evidence, a change in the law, and interference by state officials.  Id.  A petitioner is additionally required to establish prejudice, which requires showing "'actual prejudice' resulting from the errors of which he complains."  United States v. Frady, 456

U.S. 152, 168 (1982).  The alternative is proof of a "fundamental miscarriage of justice," which requires a petitioner to demonstrate that he is "actually innocent" of the crime for which he was convicted.  McCleskey v. Zant, 499 U.S. 467, 494 (1991).

Petitioner states that he "honestly tried to exhaust state remedies" but that his lack of knowledge of the law was the reason for his failure to comply with the procedural requirements for the OCCA.  (Dkt. # 16 at 11, 12, 14).  "Lack of awareness and training on legal issues" are not adequate causes for failure to comply with Oklahoma filing rules.  Rodriguez v. Maynard, 948 F.2d 684, 688 (10th Cir. 1991); see also Gilkey v. Kansas, 58 F. App'x 819 (10th Cir. 2003) (unpublished).[8]  The procedural rules required by the OCCA for post-conviction appeal are not beyond Petitioner's ability nor does compliance require knowledge of the law.  The Court finds that Petitioner fails to demonstrate "cause" sufficient to overcome the procedural bar applicable to his claims of ineffective assistance of appellate counsel.

Petitioner's only other means of gaining federal habeas review of his defaulted claims is a claim of actual innocence under the fundamental miscarriage of justice exception.  Herrera v. Collins, 506 U.S. 390, 403-404 (1993); Sawyer v. Whitley, 505 U.S. 333, 339-341 (1992); see also Schlup v. Delo, 513 U.S. 298 (1995).  To meet this test, a criminal defendant must make a colorable showing of factual innocence.  Beavers v. Saffle, 216 F.3d 918, 923 (10th Cir. 2000) (citing Herrera, 506 U.S. at 404). Under Schlup, a showing of innocence sufficient to allow consideration of procedurally barred claims must be "so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error

---

[8]This and any other unpublished disposition cited as persuasive authority pursuant to Tenth Circuit Rule 32.1.

. . . ." <u>Schlup</u>, 513 U.S. at 316.  Petitioner has the burden of persuading this Court "that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt." <u>Id.</u> at 329. "The exception is intended for those rare situations 'where the State has convicted the wrong person of the crime. . . [or where] it is evident that the law has made a mistake.'" <u>Klein v. Neal</u>, 45 F.3d 1395, 1400 (10th Cir. 1995) (citation omitted).

Petitioner does not claim, in either the petition or his reply to the response, that he is actually innocent of the crime for which he was convicted.  The Court recognizes that, at trial, Petitioner's defense was that Ms. Jennings murdered Ms. Rohde.  To the extent Petitioner's defense at trial qualifies as a claim of actual innocence, he presents no new evidence in this habeas action in support of that claim.  <u>Schulp</u>, 513 U.S. at 329.  Therefore, Petitioner does not fall within the narrow "fundamental miscarriage of justice" exception.

Accordingly, because Petitioner has not demonstrated "cause and prejudice" or that a "fundamental miscarriage of justice" will result if his claims are not considered, the Court concludes that Grounds IV, V, and VI are procedurally barred.  <u>Coleman</u>, 501 U.S. at 724.  For that reason, Petitioner's request for habeas corpus relief on Grounds IV, V, or VI shall be denied.

**D.  Certificate of appealability**

Rule 11, <u>Rules Governing Section 2254 Cases in the United States District Courts</u>, instructs that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant."  Pursuant to 28 U.S.C. § 2253, the court may issue a certificate of appealability "only if the applicant has made a substantial showing of the denial of a constitutional right," and the court "indicates which specific issue or issues satisfy [that] showing."  A petitioner can satisfy that standard by demonstrating that the issues raised are debatable among jurists, that a

court could resolve the issues differently, or that the questions deserve further proceedings.  <u>Slack v. McDaniel</u>, 529 U.S. 473, 483-84 (2000) (citing <u>Barefoot v. Estelle</u>, 463 U.S. 880, 893 (1983)).  In addition, when the Court's ruling is based on procedural grounds, the petitioner must demonstrate that "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling."  <u>Slack</u>, 529 U.S. at 484.

After considering the record in this case, the Court concludes that a certificate of appealability should not issue.  Nothing suggests that the Tenth Circuit would find that this Court's application of deference to the decision by the OCCA was debatable amongst jurists of reason.  <u>See Dockins v. Hines</u>, 374 F.3d 935 (10th Cir. 2004).  As to the claims denied on a procedural basis, Petitioner has failed to satisfy the second prong of the required showing, i.e., that the Court's ruling resulting in the denial of the claims on procedural grounds was debatable or incorrect.  The record is devoid of any authority suggesting that the Tenth Circuit Court of Appeals would resolve the issues in this case differently. A certificate of appealability shall be denied.

<u>**CONCLUSION**</u>

After careful review of the record, the Court concludes that Petitioner has not established that he is in custody in violation of the Constitution or laws of the United States.  Therefore, the petition for writ of habeas corpus shall be denied.

**ACCORDINGLY, IT IS HEREBY ORDERED** that,

1.     The clerk shall substitute Jim Farris, Warden, in place of Randall G. Workman, Warden, as

party respondent.

2.     The petition for writ of habeas corpus (Dkt. # 1) is **denied**.

3.     Petitioner's motion for ruling (Dkt. # 20) is **moot**.

4.     A certificate of appealability is **denied**.

5.     A separate judgment will be entered in this matter.

**DATED** this 22nd day of November, 2013.

*Terence Kern*

**TERENCE KERN**
**United States District Judge**

30